[Civ. No. 25688. Fourth Dist., Div. Two. Jan. 25, 1982.]

CITY OF ANAHEIM, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and FRED G.
DAVIS, Respondents.

COUNSEL

William P. Hopkins, City Attorney, and Anthony G. Stashik, Deputy City Attorney, for Petitioner.

Baziak & Winters, Ronald S. Winters, Banks, Leviton, Kelley, Drass & Kelsey, David Baziak and Seth J. Kelsey for Respondents.

OPINION

KAUFMAN, J.—The City of Anaheim (city), legally uninsured, seeks review of an order of the Workers' Compensation Appeals Board (Board) denying city's petition for reconsideration and, in effect, determining that during the period January 1, 1975, to March 27, 1979, Fred G. Davis (the applicant), employed by the city as a police detective, suffered an industrial injury "consisting of colitis." City contends that the applicant's colitis, which manifests itself in recurrent episodes of acute illness and disability, did not develop or arise during the period January 1, 1975, to March 27, 1979, but, rather, has existed since 1970 at the latest, unabated, and that city was discharged for all liability on account of the recurrent episodes and attendant medical expense by a Board-approved compromise and release in a 1974 workers' compensation case filed by the applicant. The city's contentions are sound, and the order of the Board will be annulled.

On June 18, 1974, some five years before filing the application in the case at bench, the applicant filed three related applications for adjudication of claim (74 ANA 52647, 52648 and 52649) in which, in the principal claim, he alleged injury arising out of and in the course of his employment as a police officer for the city during the period September 1960 to September 1, 1974, to his "stomach, intestines (colitis) and oth-

er internal injuries" as a result of the "[e]motional stresses and pressures of police work."

The medical reports submitted to the Board in connection with the 1974 claim left no doubt but that the applicant suffered from colitis, but it was a matter of great dispute as to whether or not his colitis arose out of and occurred in the course of the employment. The 1974 claim was resolved by a joint compromise and release in the amount of $16,430.70 which was approved by the Board as adequate by an order dated March 28, 1977.

On April 26, 1979, applicant filed with the Board an application for adjudication of the present claim (79 ANA 89483) alleging that during *the period January 1, 1975, to March 27, 1979*, he sustained an injury, colitis, as the result of stress and strain in his employment. In due course the matter was submitted on documentary evidence, including the medical reports of David MacLachlan, M.D., dated October 4 and November 8, 1979. On December 11, 1980, the WCAB judge rendered an award in favor of the applicant based on a finding that during the period January 1, 1975, to March 27, 1979, the applicant sustained injury arising out of and in the course of his employment with the city. The award contained no order for payment, presumably because the applicant had lost no uncompensated time from his employment. The award read simply: "1. Injury arising out of and in the course of said employment gastrointestinal consisting of colitis. 2. Applicant may be in need of further medical treatment. 3. Jurisdiction is reserved on attorney fees, there being no apparent source for payment." The supporting opinion of the WCAB judge read: "Based upon the medical opinion of Dr. MacLachlan, dated 10-4-79 and 11-8-79, applicant's colitis is work related."

The city petitioned for reconsideration on the same grounds asserted on review.

In his report to the Board recommending denial of the petition for reconsideration the WCAB judge repeated in pertinent part that Dr. MacLachlan was of the opinion that the applicant's colitis was "work related" and then went on: "Defendant refers to an Order approving Compromise and Release dated 3-28-77. They [*sic*] contend that this Compromise and Release together with the award of December 11, 1980 in fact gives the applicant a duplicate award. The defendants [*sic*] fail to point out one essential fact: *they* [*sic*] *were not a party to the*

*Compromise and Release* since it involved the cities [*sic*] Workers' Compensation insuror [*sic*] at that time, State Compensation Insurance Fund, and the applicant. In all probability they [*sic*] could have joined in the Compromise and Release; apparently they [*sic*] chose not to...." (Italics added.)

In its order denying reconsideration the Board adopted and incorporated by reference the report of the WCAB judge and in addition stated: "The only question before us is whether the stress of applicant's employment after the period covered by the compromise and release aggravated his colitis and contributed to his need for medical treatment for the colitis. The reports of Dr. MacLachlan justify the finding that emotional stress subsequent to 1974 has caused episodes of aggravation and disability. These episodes were industrial injuries and required medical treatment. Petitioner is not, moreover, prejudiced by this award of further medical treatment nor can it be unless a claim for some specific treatment is made. If a claim for treatment is made, petitioner will be entitled to have a day in court to present any reasonable legal or factual defense it may have against such a claim."

Thus, in fulfillment of its obligation to "state the evidence relied upon and specify in detail the reasons for the decision" (Lab. Code, § 5908.5; *Goytia* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 889, 893 [100 Cal.Rptr. 136, 493 P.2d 864]), the Board gave three reasons for its decision: (1) that the city was not aggrieved by the order; (2) that the reports of Dr. MacLachlan constitute substantial evidence "that emotional stress subsequent to 1974 . . . caused episodes of aggravation and disability" which were "industrial injuries and required medical treatment"; and (3) by incorporation of the WCAB judge's report, that the city was not a party to the compromise and release resolving the applicant's 1974 claim for permanent disability benefits on the basis of his colitis.

Before considering specifically the three reasons given by the Board for its decision, several points require clarification. First, there is not and never has been any question in this case (as distinguished from the 1974 case) but that the applicant's colitis condition was "work related" or industrially caused. The city does not contend to the contrary; it contends that the industrial injury being asserted in this case is the same industrial injury as that asserted by the applicant in the 1974 case and that liability for that injury was finally determined and adjudicated by the Board-approved compromise and release.

Second, Board was mistaken in stating that the only question before it was "whether the stress of applicant's employment after the period covered by the compromise and release aggravated his colitis and contributed to his need for medical treatment for the colitis." The compromise and release was on the form prescribed by the Board (form 15, rev. 11/74); it specifically referred to the applicant's claim of injury to his "stomach, intestines (colitis)"; it specifically stated that the compromise and release was "to cover all aspects of the applicant's injury" and incorporated the medical record by reference; it specifically purported to settle and release the employer from liability on account of all claims "whether now known or ascertained, or which may hereafter arise or develop as a result of said injury"; and it specifically provided that "[u]npaid and future medical and hospital expense is to be assumed . . . solely by applicant."

■ An approved workers' compensation compromise and release rests "upon a higher plane than a private contractual release; it is a judgment, with 'the same force and effect as an award made after a full hearing.'" (*Johnson* v. *Workmen's Comp. App. Bd.* (1970) 2 Cal.3d 964, 973 [88 Cal.Rptr. 202, 471 P.2d 1002], quoting from *Raischell & Cottrell, Inc.* v. *Workmen's Comp. App. Bd.* (1967) 249 Cal.App.2d 991, 997 [58 Cal.Rptr. 159].) Payment of a Board-approved compromise and release terminates the liability of the employer and its insurance carrier on account of the involved injury, including any liability for increased disability, unless the order approving the compromise and release has for legal cause been vacated. (*Johnson* v. *Workmen's Comp. App. Bd., supra*, 2 Cal.3d at pp. 973-975; see Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) §§ 13.9, 13.40, pp. 437-438, 467; 1 Hanna, Cal. Law of Employee Injuries & Workmen's Compensation (2d ed. 1981) § 8.04[4].)

So even if the Board were correct that Dr. MacLachlan's reports constituted substantial evidence that emotional stress from the employment subsequent to 1974 "has caused episodes of aggravation and disability," it was still required to determine whether the applicant's claim for such "aggravation [of his colitis condition] and disability" was barred by the payment of the approved compromise and release.

The Board's reference to "the period covered by the compromise and release" is presumably related to a provision in the third page of the compromise and release that reads: "This compromise and release is to cover the period of employment with the City of Anaheim until Sep-

tember 1, 1974 (the end of coverage by State Compensation Insurance Fund)." Customarily the insurance carrier prepares a compromise and release and in all probability the quoted provision was inserted by the carrier, State Compensation Insurance Fund, so that it would be a matter of record that it ceased insuring the city as of September 1, 1974, whereas the compromise and release was executed in March 1977. In any event, however, in the absence of extrinsic evidence of the intention of the parties, Board has mistaken the legal effect of the provision. It is true that the compromise and release covered only the period of employment with the city until September 1, 1974, but that is precisely the period in which the injury occurred—in which the applicant's colitis condition developed. The 1974 application for adjudication of claim specifically alleged that the applicant suffered injury to his "stomach, intestines (colitis)" during the period September 1960 to September 1, 1974. The compromise and release did not purport to restrict the release of liability to disability manifesting itself before September 1, 1974. On the contrary, as previously noted, it specifically purported to settle and to release and discharge the employer and insurance carrier "from all claims and causes of action, whether now known or ascertained, or which may hereafter arise or develop as a result of said injury" and specifically provided that "[u]npaid and future medical and hospital expense is to be assumed ... solely by applicant."

■ Turning to the specific reasons stated by the Board for its decision, we reject the assertion that the city was not aggrieved by the order. While the city might be entitled in subsequent proceedings to contest the need for any specific further medical treatment, if the present order were to stand it would constitute a binding determination that the applicant while employed by the city incurred an industrial injury, colitis, during the period from January 1, 1975 to March 27, 1979. Such a determination would carry with it all the legal obligations imposed on an employer for industrial injury by the workers' compensation act, including future medical benefits which the decision of the Board appears to have determined to be required.

■ The Board's conclusion that the city was not a party to the compromise and release must also be rejected. It is true that the compromise and release was not signed by the city, but the claim involved a period of time during which the city carried workers' compensation liability insurance with State Compensation Insurance Fund, and the latter executed the compromise and release. There can be no question but that in doing so it acted both for itself and the city.

The parties to the compromise and release are designated in the upper left portion of the first page as Fred G. Davis, applicant, the City of Anaheim, employer, and State Compensation Insurance Fund, insurance carrier. The compromise and release refers throughout to "the parties" and specifically refers to "said employer and insurance carrier" and in several places to "said employer and said insurance carrier and each of them." Additionally, in the third page entitled "REASON FOR COMPROMISE" numerous references are made to "the defendants."[1] The appellation "defendants," which was typewritten rather than preprinted, could only have had reference to both State Compensation Insurance Fund and the city.

■ Having rejected the only reason given by the Board for its conclusion that applicant's present claim is not barred by the 1977 order approving the compromise and release, it may be unnecessary for us to resolve the question whether the finding of a colitis injury during the period January 1, 1975, to March 27, 1979, is supported by substantial evidence. However, inasmuch as the question may arise in further proceedings before the Board, we proceed to do so. (Cf. Code Civ. Proc., § 43.)

As previously mentioned, the question of whether or not the applicant's colitis arose out of and in the course of his employment is not disputed. In respect to the substantial evidence problem, the critical question is whether the colitis condition from which the applicant now suffers arose or developed during the period January 1, 1975, to March 27, 1979, or during the earlier period alleged by the applicant in his 1974 claim, September 1960 to September 1, 1974. Dr. MacLachlan's reports upon which the Board placed exclusive reliance conclusively establish that the applicant's present ulcerative colitis condition arose and developed between 1968 and 1972 and has continued unabated from that time to the present. Those facts are also confirmed by evidence presented by the applicant himself.

Three reports of Dr. MacLachlan were received into evidence: a five-page report dated October 4, 1979 (the first Oct. 4 report); a two-page report also dated October 4, 1979 (the second Oct. 4 report); and a three-page report dated November 8, 1979 (the Nov. 8 report). Perti-

---

[1]E.g., "The defendants contend that all of the claimed disabilities are not the result of the alleged injury." "Defendants contend that they are entitled to an apportionment of the residual benefits herein." "The defendants desire to buy their peace."

nent portions of the first October 4 report read: "Mr. Davis was examined in my office October 1, 1979. He stated that he has continued to work regularly but has suffered from high blood pressure and ulcerative colitis.... [¶] He has had colitis onsetting in 1968 with the development of blood in 1972. In 1972 he saw a gastroenterologist, Doctor Bosco, and following a workup, was diagnosed as having ulcerative colitis. He was treated at that time with Cortisone enemas with fairly good response along with Azulfidine and supportive measures. *He has had continuous problems with his ulcerative colitis since 1968. He has times when his ulcerative colitis is quieter than at other times but always has some degree of difficulty.* Currently he has cramping, abdominal bloating, and a series of bowel movements about twice a week. The bowels may move very briskly, as many as six to twelve times, during a day of activity with his colitis. The first bowel movement tends to be solid, thereafter, the bowels are loose and explosive. In between episodes of colitis activity, he averages two to three bowel movements that are formed each day without pain or bloating. *He has had no blood recently in the last several years....* [¶] The patient ... has ulcerative colitis which is a disease process of his large bowel which results in diarrhea, bowel spasm, and gas. This disease process basically causes these symptoms. *At times of emotional stress, these symptoms will be aggravated.* Emotional stresses aggravate the symptoms but do not cause the disease. The patient's emotional stresses at work do appear to aggravate his bowel symptoms. In this regard a change of work circumstances would be indicated. It would be advisable to be in a work situation with less emotional stresses." (Italics added.)

The second October 4 report reads in pertinent part: "The patient has ... been diagnosed by Doctor Oxman as having spastic colitis. This diagnosis has been made by Doctor Oxman even in the face of a diagnosis of ulcerative colitis that the patient states historically that he has. *The patient historically has had large quantities of blood in his stools and has been treated by a gastroenterologist over a prolonged period of time for ulcerative colitis.* He even takes medications specifically for ulcerative colitis. In the face of this evidence Doctor Oxman's diagnosis of spastic colitis is unsupported and untenable. I disagree completely, the patient's records disagree, the patient's gastroenterologist disagrees, the patient's history and the way he has been treated is a total variance from such a diagnosis made by Doctor Oxman. The patient's true diagnosis is ulcerative colitis. I have gone into this in my earlier letter." (Italics added.)

The November 8 report is perhaps the most pertinent of all and contains a review of reports from the applicant's physicians from June 1970 through December 2, 1976. The report reads in pertinent part: "[The] first record reviewed was that from Dominic Bosco, dated *June 19, 1970.* At that time the patient had diarrhea and mucous in his stools. His blood pressure was described as only mildly labile. He was markedly obese. The initial impression was that of mucous colitis. A further communication from Dr. Bosco, dated *October 5, 1973*, shows that he records a blood pressure from November 30, 1971, as being 170/110. *At the time, the patient was having difficulties and rectal bleeding and diarrhea.* Apparently, subsequent blood pressures were not remarkable, since no notation was made. *The patient had a record of flare-ups of diarrhea, mucous and blood in his stools and abdominal cramping throughout the period from 1970 to 1973.* He was found to have proctitis on sigmoidoscopy in 1971. The diagnosis was made of *recurring* ulcerative colitis. He was placed on specific therapy for ulcerative colitis, including a course of cortisone enemas. *Dr. Bosco felt that the patient's work circumstances and the emotional stresses were affecting his ulcerative colitis and aggravating it.* It was his impression at the time that the patient could continue on with his present employment, and *the patient's flare-ups of his ulcerative colitis* were self-limiting and easily improved with active therapy. . . . [¶] The next record is that of Dr. Edward Dickstein, dated *September 19, 1975.* His blood pressure was 140/80, and the diagnosis was ulcerative colitis. He felt that emotional stresses would aggravate the patient's ulcerative colitis and that the patient should not be exposed to any emotional stresses. *He considered the patient stationary for rating purposes regarding his ulcerative colitis.* . . . [¶] The next report is from Dr. Padova, dated *December 2, 1976*, approximately two months after Dr. Dickstein's evaluation. The blood pressure was 140/96, which would be considered fairly normal in such an obese individual, with a large arm. *He felt that the patient's ulcerative colitis was permanent and stationary for rating purposes.* . . . [¶] *The records . . . identify that the patient has had ulcerative colitis, which has been present since 1969 and has been relative stable in recent years.* [¶] As a result of a review of these records, my opinions passed in my previous letter to you would remain unchanged." (Italics added.)

The last italicized statement in Dr. MacLachlan's report of November 8, 1979, succinctly sums up what is established by his reports and those he reviewed, "that the patient has had ulcerative colitis, which has been present since 1969 and has been relatively stable in recent years."

Dr. MacLachlan's conclusion is confirmed by the report of Dr. Dominic L. Bosco, dated *January 22, 1980*, submitted by the applicant. It states: "Fred Davis has been seen by me off and on *since 1970* for treatment of a spastic colon. *During this period of time he has had episodes of acute illness one to two days per month.*" (Italics added.)

The evidence establishes that between 1968 and September 1, 1974, the applicant developed an ulcerative colitis condition that is recurrent in nature, that is, it flares up and causes acute illness and disability in periods of stress. This is the industrial injury that was settled by the compromise and release approved by the Board in 1977. There is no substantial evidence of a new colitis injury in the period January 1, 1975, to March 27, 1979. Flareups during the period January 1, 1975, to March 27, 1979, of a recurrent colitis condition that arose and developed prior to September 1, 1974, cannot be converted into a "new" injury to avoid the effect of the earlier Board-approved compromise and release.

The order of the Board is annulled.

Morris, Acting P. J., and Tamura, J.,* concurred.

The petition of respondent Davis for a hearing by the Supreme Court was denied March 24, 1982. Bird, C. J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.